## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

SMH ENTERPRISES, L.L.C., dba
SPECTRUM INTERACTIVE

     Plaintiff,

          vs.

KRISPY KRUNCHY FOODS, L.L.C.,
PARTHENON SOFTWARE GROUP,
INC., and ANDREW SCHMITT

     Defendants.

CIVIL ACTION

CASE NO.

SECTION:

JUDGE:

MAGISTRATE:

### INTRODUCTORY STATEMENT

1.

This case arises from Defendant Krispy Krunchy Foods, L.L.C.'s ("KKF") bad faith breach of its contract with SMH Enterprises, L.L.C. by KKF's sharing of SMH's clearly identified trade secrets and materials for which SMH Enterprises had taken reasonable measures to maintain secrecy, including – but not limited to, its software source code and proprietary content elements – with unauthorized individuals, including Parthenon Software Group and Andrew Schmitt, (collectively with KKF "the Defendants") who conspired with KKF to steal SMH Enterprises' Spectrum Engine Platform for integrated training modules to be used in the over 2000 locations serving Krispy Krunchy Chicken across the United States as vendors for Krispy Krunchy Foods,

L.L.C., and its products.  SMH Enterprises's software source code and other trade secrets clearly had actual "independent economic value … from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."[1]  KKF had a contractual obligation to maintain the confidentiality of the trade secrets developed by SMH Enterprises, so any use of this information by Parthenon to develop competing software for KKF could not have been completed by proper means.  Further, the means and manner by which KKF and Parthenon stole the elements of SMH's Spectrum Engine Platform constitute willful and malicious misappropriation.[2]  SMH Enterprises brings its claims under the Defend Trade Secrets Act, the Louisiana Uniform Trade Secrets Act, the Louisiana Unfair Trade Practices and Consumer Protection Act, Section 43 (a) of the Lanham Act, 15 U.S.C. § 1125(a), and the relevant provisions of the Louisiana Civil Code.

## JURISDICTION AND VENUE

2.

Defendants are liable to SMH Enterprises for theft of its trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, the Louisiana Uniform Trade Secrets Act, Louisiana Revised Statutes 51 §1431, *et seq.*, Section 43 (a) of the Lanham Act, 15 U.S.C. § 1125(a) and the Louisiana Unfair Trade Practices and Consumer Protection Act, Louisiana Revised Statutes 51 §1401, *et seq.*  Krispy Krunchy Foods, L.L.C., is also liable for its bad faith breach of contract with SMH Enterprises for its unauthorized use of confidential information defined and protected by contract under Title IV of the Louisiana Civil Code.  To the extent that the unauthorized access and misappropriation of trade secrets by Parthenon Software Group, Inc., and Andrew Schmitt

---

[1] 18 U.S.C. §1839(3).
[2] 18 U.S.C. § 1836(b)(3)(D).

may not be found  to be governed by the contract between SMH Enterprises and Krispy Krunchy Foods, which is controlling, the Oregon Uniform Trade Secrets Act, Oregon Revised Statutes 646.641, *et seq.* will apply.  To the extent that any of the items accessed and misappropriated by Defendants are found not to be trade secrets, Defendants are also liable for conversion under Louisiana Civil Code articles 511, 515, 521, 524, 526, and 2315.

3.

Jurisdiction is proper under 28 U.S.C. §1331, as this is an action arising under the laws of the United States, namely the Defend Trade Secrets Act and the Lantham Act.  This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

4.

Venue is proper under 28 U.S.C. §1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the property at issue is situated in this District.  The contract also stipulates that venue is proper, insofar as this Court sits in Orleans Parish (pursuant to the venue provision).

## **PARTIES**

5.

SMH Enterprises, L.L.C., ("SMH") is a limited liability company operating and doing business in the Parish of Orleans, State of Louisiana.  SMH Enterprises, LLC, dba "Spectrum Interactive" is a Louisiana based software company with a focus on the e-learning and training markets. Founded in 2015, Spectrum Interactive has built a proprietary platform that is licensed

by multiple companies to use for a variety of training products including, but not limited to, food service, hospitality, fitness, and manufacturing.  SMH was previously known as Tutti Dynamics.

6.

Krispy Krunchy Foods, L.L.C., ("KKF") is a limited liability company operating and doing business in the Parish of Rapides, State of Louisiana.  KKF signed a contract with SMH in New Orleans on August 7, 2016, which was finalized on December 28, 2016.  KKF sells products to multiple Krispy Krunchy Chicken restaurants in convenience stores and gas stations in Orleans Parish – and over 2000 locations nationwide.

7.

Parthenon Software Group, Inc., ("Parthenon") is a corporation incorporated and doing business in the State of Oregon.  KKF hired Parthenon to manage its web presence, and Parthenon accessed and misappropriated SMH's trade secrets without authorization under the terms of SMH's contract with KKF.  Parthenon was hired for the position after Potenza Innovations ended its relationship with KKF.

8.

Andrew Schmitt is a person of the full age of majority, domiciled in the State of Oregon. He is the President of Parthenon, and he had unauthorized access to SMH's trade secrets and source code in clear violation of the terms of SMH's contract with KKF.

## **THE FACTS OF THE CASE**

9.

On or about June 15, 2015, KKF expressed interest in using SMH's training technology to educate the Krispy Krunchy Chicken sales force insofar as KKF was expanding its operation into Malaysia. Tina Wong, a former sales representative for Krispy Krunchy Chicken, introduced SMH and KKF.

10.

On June 17, 2015, SMH, then known as Tutti Dynamics, made a phone call to KKF to discuss the potential of the parties working together and to meet KKF's needs.

11.

On July 17, 2015, SMH's developers had a call with KKF's developers, then Potenza Innovations (predecessor to Parthenon Software Group), to discuss the technical integration needs for the platform.

12.

On July 21, 2015, the SMH team internally reviewed a draft of the proposal to KKF, and this proposal was submitted to KKF.

13.

After KKF gave its verbal approval, SMH began working on implementing the Spectrum Interactive platform and building out the requirements needed for the KKF system.  SMH expended a great deal of time, energy, and expense, into developing the platform for KKF's use.

14.

As a pilot program, KKF used and tested the Spectrum Interactive platform in Malaysia within a group of newly opening stores.  The program went live on November 2, 2015.

15.

Throughout 2016, SMH and KKF continued to work together to launch the training platform in the United States.

16.

During July of 2016, SMH and KKF were working to integrate the Spectrum Engine platform into KKF's employee portal interfaces, entitled "OHub" and "OTracker," as a teaching component of the portal.   KKF intended to use the portal to manage internal operations and communications with stores throughout the country.   KKF was responsible for producing the training materials and video content that would be used in the teaching platform. SMH was responsible for providing the technology to deliver and maintain the content and to track the progress of individual employees as they made their way through the learning process.

17.

On August 7, 2016, the parties signed an agreement entitled "Tutti Dynamics – KKC Final Proposal 08.07."  According to that document, SMH's scope of work included the following:

1.  Set-Up Browser-Based Player:

   -   Can be embedded inside of KKC Owners Portal

   -   Single Sign-On through KKC Owners Portal

   -   Streaming Video

- Features include quizzes, multiple languages, images

- Secure environment for Company video and IP

2. Set-Up Analytics / Compliance Dashboard:

   - Tracking of video usage (who, what, where etc.)

   - Tracking of video completion

3. Set-Up Content:

   - Current KKC videos will be used

   - [SMH] will facilitate creation of quizzes for each video

   - [SMH] will create translations and voice-overs

   - Initial proposal includes Spanish translation

   - [SMH] will collect, format and implement relevant supplementary content (scripts, images, checklists, etc.)

18.

Under the section entitled payment terms, the agreement stipulated as follows:

**License Fee – Initial Term**

- The term for the quoted monthly license, "Initial Term," will run for 12 months following the product launch.

- For the initial Term, the monthly license fee will remain at $2,160 even if number of stores and accounts increase as long as data limits aren't exceeded and new servers aren't required.

- After the Initial Term, the monthly license fee will be renegotiated.

19.

On December 28, 2016, SMH and KKF agreed to all contract terms to govern their relationship, recognized the change of the name of "Tutti Dynamics" to "Spectrum Interactive," and incorporated the "Spectrum Interactive White-label Solutions Terms and Conditions" into the contract (this addition was accepted by Krispy Krunchy Chicken).

20.

On that same date, SMH received a fully executed and signed copy of the contract between KKF and SMH (entitled 2016.12.07 – "Krispy Krunchy Terms and Conditions" and hereafter "the Contract.").  The relevant terms included:

- **Section 1: Confidentiality**
  With respect to this Agreement and any information supplied in connection with this Agreement and designated by the disclosing party as confidential, the recipient agrees to: (i) protect the confidential information in a reasonable and appropriate manner or in accordance with applicable professional standards; (ii) use confidential information only to perform its obligations under this agreement; and to refrain from using confidential information in any manner other than in furtherance of any Statement of Work and (iii) reproduce confidential information only as required to perform its obligations under this Agreement.  This section shall not apply to information which is (i) publicly known; (ii) already known to the recipient; (iii) disclosed to a third party without restriction; (iv) independently developed without use of the confidential information; or (v) disclosed pursuant to an order o[f] a court of competent jurisdiction or other governing body.  Subject to the foregoing, Spectrum may disclose Client's confidential information to its subcontractors and affiliates; provided such parties are bound to confidentiality restrictions at least as restrictive as those in this Agreement.  For purposes of this Agreement, "confidential information" shall mean any proprietary information, technical data, trade secrets or know-how, including but not limited to, research, product plans, products, services, customer lists and customers (of either party), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to the other party either directly or indirectly in writing, orally or by drawings or observation of parts or equipment.  Notwithstanding the foregoing, "confidential information" does not include Spectrum Intellectual Property (as defined below).

- **Section 2: Deliverables; Intellectual Property**
  Spectrum is the owner or licensee of certain Augmented Video Content related to audio/video learning and entertainment ("**AVC**") software permitting end-users to "play" AVC from their desktops and/or mobile devices and future updates or new versions of this software ("**Spectrum Engine**"), and server-based technology that allows Spectrum to

8

distribute the AVC to permitted sublicensees. Spectrum assembles custom systems using proprietary pre-built code modules comprising AVC and the Spectrum Engine, owned by Spectrum and open source code. All pre-existing or customizable developed code modules utilized by Spectrum in the AVC or Spectrum Engine is and shall be owned by Spectrum (the "**Spectrum Intellectual Property**"). All pre-existing video content delivered by company to Spectrum shall remain the property of Company and shall not be used or disseminated by Spectrum for any purposes outside of the Scope of Work issued under this Agreement. Spectrum is approved to include one Company video in its private, password protected demo site for the purpose of showcasing its technology.

Spectrum will deliver to Client a customized, Client branded Spectrum Engine platform for download and/or streaming (the "**Deliverables**"). The customized Deliverables shall remain the exclusive property of Spectrum. The pre-existing video content delivered by Company to Spectrum shall remain the property of Company.

Subject to and only upon Client's satisfaction of all outstanding balances and compliance with the terms of this Agreement, Spectrum hereby grants to Client the non-exclusive, world-wide, royalty-free license to use (without the right to sublicense) the Deliverables for the purpose of distributing the Deliverables to end users.

Spectrum retains sole ownership of any Spectrum Intellectual Property, and nothing in this Agreement or otherwise transfers or assigns any ownership or other interest in or to the Spectrum Intellectual Property.

Spectrum is in the business of developing solutions for a wide variety of clients, and Client understands that Spectrum will continue these activities utilizing its Spectrum Intellectual Property (including providing AVC and customized Spectrum Engine platforms), as well as derivatives of any components developed prior or during the terms of its service to Client, whether or not such Spectrum Intellectual Property was used in Client's systems or the Deliverables.

The Deliverables shall include the "Spectrum Interactive" and/or "Spectrum Engine" logo, graphics or marks (as applicable) (collectively, the "**Spectrum Marks**") for the purpose of demonstrating that the Deliverables have been provided by Spectrum, and Spectrum hereby grants Client the limited, world-wide, irrevocable, royalty-free license (without the right to sublicense) to use the Spectrum Marks in accordance with the foregoing purpose.

Client hereby grants to Spectrum the limited, irrevocable, world-wide, royalty-free license (without the right to sublicense) to use the logos, trademarks or other identifying marks associated with Client for the purpose of identifying Client as a client or former client (so long as no Confidential Information is disclosed). Spectrum grants to Client the limited, revocable, world-wide, royalty-free license (without the right to sublicense) to use the logos, trademarks or other identifying marks associated with Spectrum for the purpose of identifying that Services have been provided by Spectrum. So long as either Spectrum or Client merely reference or display any of the foregoing logos, trademarks, or identifying marks associated with the other party with a short description of Services, neither party

shall need to obtain the permission of the other party. However, prior to any extended description of the Services by either party to the press, media outlets or other third parties, the party so describing the Services shall obtain the prior written consent of the other party.

Client represents and warrants that it owns all right, title and interest in and to all of the audio, video, text, photographic, graphical, metadata or other content provided to Spectrum for purposes of inclusion in the Deliverables (the "**Client Content**"). Client hereby grants to Spectrum the limited, irrevocable, world-wide, royalty-free license (without the right to sublicense) to use, make derivative works of and incorporate the Client Content into the Deliverables.

If Client breaches a material provision of this Agreement (or any Scope of Work, as applicable) and does not cure such breach within thirty (30) days after written notice from Spectrum, Spectrum will have the right at its option to (a) preclude use of the Deliverables by Client or any or all users until such breach is cured; (b) terminate this Agreement, such that Client or any or all users must cease all use of the Deliverables; or (c) seek a combination of (a) and (b) and those remedies available at law or equity to the extent not limited by this Agreement. The election of options (a), (b), or (c) herein will not excuse the Client (or any Participant) from any obligation arising prior to the date of termination. Spectrum reserves the right to terminate the Agreement in the event Client has breached a material provision of the Agreement two (2) or more times, regardless of whether Client has cured such breaches within the permitted time.

If Client uses the Deliverables in an unauthorized manner, Spectrum will have the right at its option to: (a) preclude use of the Deliverables by Client and any or all users until such time as Client converts or limits their use of the foregoing exclusively to an authorized use; or (b) terminate this Agreement, such that Client and any or all users must cease all use of the Deliverables. The election of options (a) or (b) herein will not excuse the Client from any obligation arising prior to the date of termination. For the avoidance of confusion, authorized uses include use by Company employees, Company partner stores and their employees through the Company's online training portals. If Spectrum uses any of the licensed intellectual property of Client in an unauthorized manner, Client will have the right to terminate this Agreement.

Upon termination of this Agreement for any reason, Client (and any or all user(s)) will cease use of the Deliverables immediately. If applicable, Client will return to Spectrum all copies of the software and the associated documentation in its possession or control, and immediately destroy any copies of the Deliverables installed on any servers at its location. Client will provide to Spectrum written notice of such destruction, signed by an officer of Client, within thirty (30) days of termination. Spectrum will not be liable to the Client for damages of any sort as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement will be without prejudice to any other right or remedy of either party. Spectrum reserves the right to remotely delete, block access to and/or uninstall the Deliverables and/or associated Interactive Videos in the event of termination of this Agreement.

- **<u>Section 7.  Termination</u>**
  (a) This Agreement may be terminated at any time by either party upon thirty (30) days written notice to the other.

  (b) Client shall pay Spectrum for all Services rendered and expenses incurred as of the date of termination, and shall reimburse Spectrum for all reasonable costs associated with any termination, including any specific termination fees for any service contracts in effect at time of termination.  To the extent quoted on a flat fee or phase basis and termination occurs prior to the completion of any particular phase or other criteria set for such flat fee services, Spectrum may elect to charge Client for and Client shall pay for Services at an hourly rate then prevailing for services (or, if no hourly rate then prevails, at $100/hour) if Services are terminated before Deliverables are completed.

  (c) Except for matters related to confidentiality or intellectual property rights (including without limitation the obligations of indemnity with respect to any intellectual property), the parties shall first attempt to resolve any dispute or alleged breach internally by escalating it to each party's management with final decision-making authority over the disputed issue; thereafter, and prior to either party initiating litigation, the parties agree to refer the matter to arbitration within thirty (30) days of the failure of the parties' management to resolve the issue, with such arbitration to be held before the American Arbitration Association in New Orleans, LA.

21.

The parties also agreed to limit their liability, "to the extent not contrary to applicable law."

22.

 Per the terms negotiated by the parties, SMH agreed to provide the technology to support the Krispy Krunchy Chicken learning platform and development for KKF in December of 2016. The system was tiered so that the senior level leadership team, with Administrator level access, had a dashboard that showed the progress of every employee.  The district manager could see every employee in the district; the store manager could see every employee in the store; and the employee was limited to viewing his or her own progress.

23.

SMH rigorously protects the confidentiality of its source code, software documentation and related proprietary information for its software platform and backend API.  Further, software provided through a licensing agreement is subject to strict limited access, use, confidentiality, and non-disclosure agreements.

24.

After the initial term, SMH attempted to negotiate a proper licensing fee on multiple occasions, in accordance with the terms of the Final Proposal signed on August 7, 2016.

25.

On four or five occasions between 2017 and 2019, KKF notified SMH that the system did not appear to be working.[3]  On January 5, 2017, a Parthenon change to the software created an error that was blamed on SMH.  On September 8, 2017, there were multiple issues with the API caused by Parthenon and blamed on SMH.  On September 27, 2018, Parthenon made a change to the software that was blamed on SMH.  On December 11, 2018, Parthenon made changes to KKF's API that caused the video player to go down; these changes were blamed on SMH.  On February 5, 2019, a data input error caused the video to go down for a certain set of users.  SMH was contacted, but the issue was resolved by Parthenon.  On July 1, 2019, there were API issues created by Parthenon over a period of days for which SMH was blamed.  These items were addressed by SMH, but the delay in Parthenon's response exacerbated the problem, which KKF blamed on SMH.  On July 24, 2019, Parthenon made a change to the API that caused problems for the training

---

[3] On October 23, 2018, a Denial of Service (DDoS) attack took the platform down for a few hours, and on August 26, 2019, a bug was created for Spectrum when Chrome was updated.  Other than in these two instances, all issues with the platform were caused by Parthenon.

platform users.  SMH identified the problem with Parthenon's changes.   On each of these occasions, the problem was created by Parthenon.  Every hour the SMH system would ping the Parthenon system to determine which users should have access (as a security measure), so they would not have any issues when they attempted to log into the system.  Every time, SMH would call or email Andrew Schmitt and ask him to address the problem.  On information and belief, Andrew told KKF that the SMH platform was unreliable in an effort to take the training platform business away from SMH.

26.

Over the course of the relationship between SMH and KKF,  five Parthenon  employees, none of whom are "Company employees, Company partner stores … [or] their employees through the Company's online training portals," created Administrator level accounts (accounts that gave them access to the full Spectrum Interactive platform) in the Spectrum Interactive training platform, which KFF managed pursuant to the clear terms listed above.

- On October 6, 2016, Jessica Wilson (Lead Copy Editor) created an account.[4]

- On November 16, 2018, Andrew Schmitt (President), Simon Moon (Developer), Andrew Kettel (Developer), and Steven Sun (Developer) created accounts.  All four of these accounts were used to access the Spectrum Interactive system.

27.

On November 12, 2019, KKF notified SMH of its intent to terminate the contract, in accordance with Section 7(a).

_____

[4] Jessica Wilson apparently left Parthenon in July of 2017, and her account was never used to access the Spectrum Interactive system.

13

28.

KFF gave this termination notice verbally to the former CEO of SMH, Kristen Sullivan McEntyre.  No written notice was given, though it was required by Section 7 of the Contract.  At no point during the following thirty-day transition period did KKF request any information from SMH relating to the transition of content, data, or user progress from the Spectrum Interactive training platform to any new system.

29.

After the new training platform's release, SMH partner Conway Solomon used his original and still valid credentials to log into the Krispy Krunchy Chicken platform – oTracker – to view the new system.  Under the tab labeled "Interactive Training," he discovered a full recreation of the Spectrum Interactive training platform with slight immaterial differences in place of the SMH model.  At that time, the entire structure of Spectrum Interactive's API[5] had been copied line for line, and every one of the items linked to the new system was aligned to the Spectrum Interactive database line for line, in line with the specific structure of the API itself.  Having misappropriated the SMH trade secrets, Parthenon had then reverse engineered them into the new interface

30.

To illustrate the similarity of the new platform to the Spectrum Interactive platform, KKF and Parthenon even left SMH's proprietary video titled "How to Use the Training Player" in place. The video includes the Spectrum Interactive logo embedded in the middle of the player.

---

[5] Application Programming Interface

31.

By misappropriating SMH's trade secrets in this fashion, Parthenon and Andrew Schmitt saved themselves hundreds of hours of coding work and saved KKF (and, by extension, themselves) at least hundreds of thousands of dollars in development costs and fees. On information and belief, the misappropriation of SMH's trade secrets and source code is ongoing.

32.

Parthenon also posted a case study, "Fast Food Franchise Mobile Sales App,"[6] wherein it took credit for creating the stolen training platform.

> Training was also an area that was consuming a large amount of staff effort. Staff turnover requires a constant attention to make sure all locations meet the corporate standards. To streamline this process the testing materials needed to be adapted to an online system that could serve the video content and administer a test afterwards.
>
> ….
>
> The education system was adapted into an online curriculum that serves videos encoded once for Apple devices and into a second format for desktop computers. Each video must be watched in its entirety and a series of questions must be answered correctly before a module is considered complete. The user interface and test questions are displayed in English and Spanish depending on the candidate's preferred language. Employees can take the tests from any mobile device or desktop at their own pace. All results are centrally recorded and instantly available to store owners automatically and can be reviewed at any time.

**THE SPECTRUM ENGINE**

33.

The "Spectrum Engine" is a multi-component product that consists of a training video player, a training testing component, an analytics component, and a backend infrastructure

---

[6] Available at: https://www.parthenonsoftware.com/our-work/fast-food-franchise-mobile-sales-app/

including API for data management.  The information was stolen, and KKF and Parthenon used the stolen information to recreate and/or unlawfully reverse engineer the entire database and architecture of the Spectrum Interactive training platform so there would appear to be no disruption in service to the Krispy Krunchy users.  The features that were stolen include, but are not limited to:

1. **The Training Video Player Component**

    a. Overall Video Player Design

        i. The layout, design, and user experience of the video player, quizzes, tests, controls, and icons.

    b. Hot Spots

        i.  A feature that layers a clickable item over a video to provide more contextual information.[7]

    c. Layered Texted Descriptions

        i. A feature that allows for text to be displayed alongside a video as it is playing.

    d. Integrated Quizzes and Surveys

        i. A feature that allows users to take quizzes based on the relevant video that is being displayed to the user.

    e. Language Control

---

[7] The code for the Hot Spots was copied into the Parthenon software metadata, but they did not replicate the feature itself.

      i.   A feature that allows users to switch to the language of their choice between English and Spanish, at which point the audio and text of all the videos will be changed to reflect the new language.

f.   Playlists

      i.   A feature that allows users to choose a relevant video based upon the selected category videos. The playlist also represents and contains information reflecting the progress of a user in the position of the video and quiz results.

2.  **Training Testing Component**

a.   Overall Training Testing Component Design

      i.   The layout, design, and user experience of the testing component, controls, and icons.

b.   Certificate Generation

      i.   A feature that automatically generates a certificate of completion for any user who has completed or passed the course.

c.   Final Test

      i.   A feature that allows the user to complete a final exam or test once all of the videos and short quizzes have been completed and passed successfully.

d.   Completion Logic

      i.   A feature that requires the user to receive a certain completion score before being able to complete their training.

3.  **Backend API**

In order to deliver training videos successfully with the corresponding information to offer text overlays, quizzes, final exams, certificates, language translations, etc., properly, SMH developed a proprietary backend database and API that connects all of these components together.

Essentially, KKF and Parthenon copied and reverse engineered the structure of SMH's database and API and also scraped SMH's server for the video tutorial content – including all of the videos, quizzes, tests, and final exams.

In addition to the video and tutorial content, it also appears that KKF and Parthenon copied and scraped the video and tutorial progress of the individual users, which is specifically and uniquely data that is protected and owned by SMH.

4.  **Overall Platform Components**

    a.  Integration into Other Platforms

        i.  A feature that allows the Spectrum Engine to be embedded into other platforms through the use of APIs and embedded HTML frames.

**CAUSE OF ACTION NO. 1:**
**BAD FAITH BREACH OF CONTRACT**

34.

SMH hereby incorporates the allegations set forth in paragraphs 1 through 33 as though fully set forth herein.

35.

In sharing SMH's confidential information, clearly defined as such by the Contract, and their intellectual property with Parthenon and Andrew Schmitt, KKF violated the contract by authorizing the Parthenon users to create Administrator level accounts  even though they were not and could not have been considered "Company employees, Company partner stores … [or] their employees through the Company's online training portals."  SMH had every reason to believe that KKF would perform its obligations under the contract in good faith, but KFF's bad faith is evidenced by the fact that it terminated its relationship with SMH and paid Parthenon and Andrew Schmitt to provide the same product KKF  had helped them to steal.

36.

Because KKF breached the contract in bad faith, Louisiana Civil Code articles 1997 and 2004 apply, and any attempt by KFF to limit its liability would be against public policy and destroy the overriding principle of good faith.[8]

37.

SMH is entitled to all appropriate damages including, but not limited to lost fees, costs, and other payments, consequential damages, foreseeable or not, interest as provided by law, and enforcement of the remedies provided in the contract.

---

[8] See La. Civ. Code art. 2004.

38.

SMH's action for breach of contract is timely because it is brought within ten years of the date when the breach occurred, and the action for unpaid fees is timely because it is brought within three years of the date when payment was due.

## CAUSE OF ACTION NO. 2:

## MISAPPROPRIATION OF PROTECTED TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, ET SEQ.

39.

SMH hereby incorporates the allegations set forth in paragraphs 1 through 38 as though fully set forth herein.

40.

SMH's source code, backend infrastructure database, and API constitute trade secrets because they include "forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing."[9]  Further, SMH took reasonable measures to keep the information secret, and "the information derives economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."[10]

---

[9] 18 U.S.C. § 1839(3).
[10] Id.

20

41.

Defendant KKF violated the Defend Trade Secrets Act by disclosing SMH's trade secrets without SMH's express or implied consent when KKF knew that the secrets had been "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret[s]."[11]

42.

Defendants Parthenon Software and Andrew Schmitt violated the Defend Trade Secrets Act by acquiring SMH's  trade secrets  when they knew "or had reason to know that the trade secret[s] were acquired by improper means."[12]  In this context, improper means "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  To the extent that Defendants' process involved scraping information from SMH's server, courts have found that "[t]here can be no doubt that the use of a computer software robot to hack into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret, and thus is misappropriation."[13]  "Under the legal definition, reverse engineering may not occur without legitimate acquisition."[14]  As such, any "reverse engineering" done by Parthenon from SMH's trade secrets could not have been lawful.

43.

SMH is entitled to all appropriate damages including, but not limited to, damages for the actual loss caused by the misappropriation of its trade secrets, damages for unjust enrichment by

---

[11] 18 U.S.C. § 1839(5)(B).

[12] *Id.* at § 1839(5)(A).

[13] *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1314–15 (11th Cir. 2020)(*quoting Physicians Interactive v. Lathian Sys., Inc.,* No. CA 03-1193-A, 2003 WL 23018270, at *8 (E.D. Va. Dec. 5, 2003)).

[14] *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1026 (E.D. Wis. 2010).

Defendants, injunctive relief and/or civil seizure, exemplary damages for willful and malicious misappropriation, and reasonable attorney's fees.[15]

44.

SMH's action for violation of the Defend Trade Secrets Act is timely because it has been brought within three years after the date on which the misappropriation with respect to which the action would relate was discovered.

**CAUSE OF ACTION NO. 3:**

**MISAPPROPRIATION OF SMH'S TRADE SECRETS UNDER THE LOUISIANA UNIFORM TRADE SECRETS ACT, LA. R.S. 51 § 1431, *ET SEQ.***

45.

SMH hereby incorporates the allegations set forth in paragraphs 1 through 44 as though fully set forth herein.

46.

Under the Louisiana Uniform Trade Secrets Act, which defines misappropriation very similarly to the Defend Trade Secrets Act, KKF misappropriated SMH's trade secrets when it "disclosed or used" them "without express or implied consent by a person" who knew that they had been "derived from or through a person who owed a duty to the person seeking relief to maintain [their] secrecy or limit [their] use."[16]

---

[15] 18 U.S.C. § 1836(B)(3).
[16] La. Rev. Stat. § 51:1431(2).

47.

Under the Louisiana Uniform Trade Secrets Act, Parthenon and Andrew Schmitt misappropriated SMH's trade secrets when they acquired them knowing or having reason to know "that the trade secret[s] were acquired by improper means."[17]

48.

SMH is entitled to all appropriate damages including, but not limited to, injunctive relief, damages for the actual loss caused by the misappropriation, damages for the unjust enrichment not taken into account in calculating damages for actual loss, and attorney's fees on grounds that the misappropriation was willful and malicious.[18]

49.

SMH's action for violation of the Louisiana Uniform Trade Secrets Act is timely because it has been brought within three years after the misappropriation was discovered or by the exercise of reasonable diligence should have been discovered.

## CAUSE OF ACTION NO. 4:

## UNFAIR COMPETITION UNDER THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, LA. R.S. 51 § 1401, *ET SEQ.*

50.

SMH hereby incorporates the allegations set forth in paragraphs 1 through 49 as though fully set forth herein.

---

[17] *Id.* The definition of "improper means" under the LUTSA is identical to that under the DTSA.
[18] La. Rev. Stat. §§ 51:1432-1434.

51.

Defendants KKF, Parthenon, and Andrew Schmitt engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of … trade or commerce" under the Louisiana Unfair Trade Practices and Consumer Protection Act when they conspired to steal SMH's trade secrets. SMH owned its trade secrets; it communicated this information to KKC under an express agreement limiting its use or disclosure; and KKF transmitted these trade secrets to Parthenon and Andrew Schmitt to SMH's injury.[19]

52.

SMH is entitled to all appropriate damages, as a party that suffered an "ascertainable loss of money or movable property, corporeal or incorporeal," including, but not limited to, actual damages and attorney's fees and costs.

53.

SMH's action for the violation of the Louisiana Unfair Trade Practices and Consumer Protection Act is timely because it has been brought within one year of the transaction or act that gave rise to the right of action.[20]

---

[19] La. Rev. Stat. § 51:1401, *et seq.*
[20] La. Rev. Stat. §51:1409(E).

**CAUSE OF ACTION NO. 5:**

**CONVERSION OF SMH'S CONFIDENTIAL MATERIALS NOT FOUND TO BE TRADE SECRETS**

54.

SMH hereby incorporates the allegations set forth in paragraphs 1 through 53 as though fully set forth herein.

55.

To the extent that this Court might find that any of the materials stolen by KKF, Parthenon, and/or Andrew Schmitt do not qualify as trade secrets, then they have been converted.

56.

In Louisiana, "an act of conversion is an intentional tort committed in derogation of the plaintiff's possessory rights."[21] Conversion is "committed when any of the following occurs: (1) possession is acquired in an unauthorized manner; (2) the chattel is removed from one place to another with the intent to exercise control over it; (3) possession of the chattel is transferred without authority; (4) possession is withheld from the owner or possessor; (5) the chattel is altered or destroyed; (6) the chattel is used improperly; or (7) ownership is asserted over the chattel."[22]

57.

SMH is entitled to all appropriate damages including, but not limited to, the return of the software components themselves or the value of the property at the time of conversion.

---

[21] *Dileo v. Horn*, 15-684, p. 9 (La. App. 5 Cir. 3/16/16); 189 So. 3d 1189, 1198.
[22] *Id.*

58.

SMH's action for conversion is timely because it is brought within one year of the time when SMH was on notice of the act of conversion.

## **CAUSE OF ACTION NO. 6**

## **TRADE DRESS INFRINGEMENT**

59.

SMH hereby incorporates the allegations set forth in paragraphs 1 through 58 above as though fully set forth herein.

60.

SMH's platform's designs and language choices are widely recognized by the consumers who use the Spectrum Training Platform and these designs and choices have become a valuable indicator of the source and origin of the information provided, which in turn, drives SMH's sales. Among the consumers who use the Spectrum Training Platform are a nationally recognized university, a music school and music festival, and fitness trainers to name a few.

61.

Upon information and belief, due to SMH's operations as an online resource for training KKF's franchisees, KKF's franchisee training system is now a market leader in the industry.

62.

Defendants copied SMH's stylistic choices, including the design, layout, wording, color-scheme, and font choices, of SMH's training program.

26

63.

Examples of the "look and feel" components of the SMH's Spectrum Engine, which Defendants copied, include, but are not limited to the layout, fonts, and other non-functional aesthetic choices that are imitated in Defendants' program.

64.

The foregoing aesthetic, stylistic, and non-functional elements of SMH's Spectrum program, taken together, create a distinctive look and feel to SMH's program.

65.

Defendants have had fraudulent access to SMH's program, web-application, processes, template downloads, know-how, and design for the entire time KKF used SMH's Spectrum software and Defendants have been building Defendants' competing program and products, including the entirety of the time spent.

66.

Consumers, including even any KKF franchise owners and their staff,  are likely to be confused as to the source or affiliation of Defendants' software with SMH's software as Defendants have misappropriated SMH's design; the software programs bear a striking similarity in look and feel concerning the aesthetic, stylistic, and non-functional elements identified above; both programs are marketed to consumers in the identical industry (namely, training); and both programs rely on the same advertising channels.  Moreover, due to Defendants' fraudulent access to SMH's software and misappropriation of SMH's intellectual property, the copying of SMH's program is believed to be intentional.

67.

Defendants' use in commerce of SMH's software content is confusingly similar to SMH's and/or use of confusingly similar "look and feel" is likely to cause confusion, or to cause mistake, or to deceive consumers as to the affiliation, connection, or association of Defendant with SMH, or as to the origin, sponsorship, or approval of the Defendant's services, information, or commercial activities with SMH in violation of 15 USC § 1125(a).

68.

As a direct and proximate result of Defendant's violation of SMH's trade dress, SMH has suffered and continues to suffer damages to its profits, sales, and business.

69.

SMH is entitled to recover damages pursuant to 15 USC § 1121, et seq., as well as injunctive relief.

## **PRAYER**

WHEREFORE, Plaintiff, SMH Enterprises, L.L.C., respectfully prays that, after due proceedings are held, there be judgment in its favor against Defendants for the following:

(1) Return of the costs of developing the Spectrum Engine;

(2) Return of the lost fees and costs wrongfully paid to Parthenon and Andrew Schmitt;

(3) Injunctive relief;

(4) Return of any property wrongfully converted;

(5) Consequential damages;

(6) Exemplary damages as provided by law;

(7) Attorney's fees as provided by law;

(8) Interest as provided by law;

(9) All other appropriate relief under law and equity.

Respectfully Submitted,

CARA STONE, LLP.

/s/ James A. Morock, Jr.
Mark Graffagnini, Bar Roll No. 30527
James A. Morock, Jr., Bar Roll No. 36756
Walter Wolf, Bar Roll No.21953

5408 Magazine Street
New Orleans, Louisiana 70115
(504) 265-9955 (phone/fax)
wwolf@carastone.com
mg@carastone.com
jmorock@carastone.com