Exhibit A

## AFFIDAVIT OF CONWAY SOLOMON

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

BEFORE ME, the undersigned Notary Public, personally came and appeared

CONWAY SOLOMON

who being duly sworn did depose and state:

1.  I am a person of the age of majority and competent in all respects to gibe this Affidavit.  My testimony is based on personal knowledge and upon documents maintained in the files of SMH Enterprises, L.L.C.;

2.  SMH Enterprises, L.L.C. is headquartered in New Orleans, Louisiana. I am the Manager of SMH Enterprises, L.L.C., with primary responsibility for the fundraising, development, and oversight of the Spectrum Engine.  In my role as Manager, I am authorized to provide this Affidavit on behalf of SMH Enterprises, L.L.C.;

3.  I have read SMH's Complaint in this matter and I have read SMH's Motion for a Temporary Restraining Order;

4.  The facts stated in both the Complaint and the Motion for Restraining Order are true and accurate to the best of my knowledge and belief;

5.  The Spectrum Engine is a multi-component software product that consists of a training video player, a training testing component, an analytics component, and a backend infrastructure including API for data management;

6.  The Spectrum Engine is the primary software product created by SMH Entrerprises, L.L.C., and it is comprised of the Company's trade secrets.

7.  On August 7, 2016, SMH Enterprises, L.L.C. signed an agreement entitled "Tutti Dynamics – KKC Final Proposal 08.07" with Krispy Krunchy Foods, L.L.C. ("KKF")

8.   On December 28, 2016, the Parties agreed to all contract terms to govern their relationship, recognized the change of the name of "Tutti Dynamics" to "Spectrum Interactive," and incorporated the "Spectrum Interactive White-label Solutions Terms and Conditions" into the contract.

9.   The relevant terms included a Section 1 which provides for confidentiality between the parties, with KKF agreeing to "(i) protect [SMH's] confidential information in a reasonable and appropriate manner or in accordance with applicable professional standards; (ii) use confidential information only to perform its obligations under this agreement; and to refrain from using confidential information in any manner other than in furtherance of any Statement of Work and (iii) reproduce confidential information only as required to perform its obligations under this Agreement."

10.  A true and correct copy of the "Spectrum Interactive White-label Solutions Terms and Conditions" is attached hereto as Exhibit "1."

11.  By misappropriating SMH's trade secrets in this fashion, Parthenon and Andrew Schmitt saved themselves hundreds of hours of coding work and saved KKF (and, by extension, themselves) at least hundreds of thousands of dollars in development costs and fees.  On information and belief, the misappropriation of SMH's trade secrets and source code is ongoing.

12.  Among the "confidential information" that SMH gave KKF  access to per the Agreement were key and critical trade secrets that were at the heart of the Spectrum Engine.

13.  The Spectrum Engine is the principal and most valuable asset that SHM owns.  Loss of the Spectrum Engine would deprive SMH of its only source of income.

14.  If KKF and its fellow defendants are allowed to further disclose and misappropriate SMH's intellectual property, including its trade secrets embodied in the Spectrum Engine, SMH will suffer a range of harm, including losses that would be, for practical purposes, virtually

impossible to compensate with money. The defendants' actions if allowed to continue would mean the virtual destruction of SMH;

15. SMH, as a promising new company, relies heavily on the ability to attract investors and venture capital. SMH's ability to attract future investment will also be destroyed if the defendants are allowed to continue exploiting SMH's trade secrets;

16. All of the foregoing is true and correct to the best of my knowledge and belief.

Further the affiant says naught.

_____
CONWAY SOLOMON

SWORN TO AND SUBSCRIBED BEFORE ME
THIS 13th DAY OF NOVEMBER, 2020

_____
NOTARY PUBLIC

My Commission is for Life.

OFFICIAL SEAL
JAMES ANDREW MOROCK, JR., ESQ.
BAR ROLL # 36756
STATE OF LOUISIANA
PARISH OF ORLEANS
My Commission is for Life

# Exhibit 1

Spectrum Interactive
839 St Charles Ave #200
New Orleans, LA 70130
**504.450.8960**



**Amendment to Krispy Krunchy Chicken Agreement Titled "Tutti Dynamics – KKC Final Proposal 08.07"**

As of September 1, 2016, the contract titled "Tutti Dynamics – KKC Final Proposal 08.07" will be amended as follows:

- References to "Tutti Dynamics" will be changed to "Spectrum Interactive", the name under which the company now operates.

- Exhibit A titled "Spectrum Interactive White-label Solutions Terms and Conditions" will be added to the contract and accepted by Krispy Krunchy Chicken.

Signed and Agreed,

Representative of Tutti Dynamics / Spectrum Interactive

*Kristen S. McEntyre*
Name: Kristen S. McEntyre
Title: Partner, CEO

September 1, 2016
Date

Representative of Krispy Krunchy Chicken

*Daniel Shapiro*
Name:
Title:

_____
Date

**SPECTRUM INTERACTIVE**
**WHITE LABEL SOLUTIONS**
**TERMS & CONDITIONS**

These White Label Terms & Conditions constitute an agreement between the entity or person identified on the foregoing and (this "***Agreement***") shall govern the Services provided by SMH Enterprises, LLC dba Spectrum Interactive ("***Spectrum***") as set forth in the Scope of Work issued to Client. Multiple Scopes of Work may be issued under this Agreement, and the terms of each such Scope of Work shall be governed by this Agreement, unless otherwise agreed to in writing by the Company and Spectrum. This Agreement, together with the applicable Scope(s) of Work constitute the entire understanding and agreement between Client and Spectrum with respect to the Services, supersede all prior oral and written communications, and may only be amended, modified or changed in writing signed by both parties. If there is a conflict between this Agreement and the terms of any Scope of Work, this Agreement shall govern unless otherwise expressly acknowledged by the parties.

### Section 1. Confidentiality

With respect to this Agreement and any information supplied in connection with this Agreement and designated by the disclosing party as confidential, the recipient agrees to: (i) protect the confidential information in a reasonable and appropriate manner or in accordance with applicable professional standards; (ii) use confidential information only to perform its obligations under this Agreement; and to refrain from using confidential information in any manner other than in furtherance of any Statement of Work and (iii) reproduce confidential information only as required to perform its obligations under this Agreement. This section shall not apply to information which is (i) publicly known, (ii) already known to the recipient; (iii) disclosed to a third party without restriction; (iv) independently developed without use of the confidential information; or (v) disclosed pursuant to an order or a court of competent jurisdiction or other governing body. Subject to the foregoing, Spectrum may disclose Client's confidential information to its subcontractors and affiliates; provided such parties are bound to confidentiality restrictions at least as restrictive as those in this Agreement. For purposes of this Agreement, "confidential information" shall mean any proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (of either party), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to the other party either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. Notwithstanding the foregoing, "confidential information" does not include Spectrum Intellectual Property (as defined below).

### Section 2. Deliverables; Intellectual Property

Spectrum is the owner or licensee of certain Augmented Video Content related to audio/video learning and entertainment ("***AVC***") software permitting end-users to 'play' AVC from their desktops and/or mobile devices and future updates or new versions of this software ("***Spectrum Engine***"), and server-based technology that allows Spectrum to distribute the AVC to permitted sublicensees. Spectrum assembles custom systems using propriety pre-built code modules comprising AVC and the Spectrum Engine, owned by Spectrum and open source code. All pre-existing or customizable developed code modules utilized by Spectrum in the AVC or Spectrum Engine is and shall be owned by Spectrum (the "***Spectrum Intellectual Property***"). All pre-existing video content delivered by Company to Spectrum shall remain the property of Company and shall not be used or disseminated by Spectrum for any purposes outside the Scope of Work issued under this Agreement. Spectrum is approved to include one Company video in its private, password protected demo site for the purpose of showcasing its technology.

Spectrum will deliver to Client a customized, Client branded Spectrum Engine platform for download and/or streaming (the "***Deliverables***"). The customized Deliverables shall remain the exclusive property of Spectrum. The pre-existing video content delivered by Company to Spectrum shall remain the property of Company.

Subject to and only upon Client's satisfaction of all outstanding balances and compliance with the terms of this Agreement, Spectrum hereby grants to Client the non-exclusive, world-wide, royalty-free license to use (without the right to sublicense) the Deliverables for the purpose of distributing the Deliverables to end users.

Spectrum retains sole ownership of any Spectrum Intellectual Property, and nothing in this Agreement or otherwise transfers or assigns any ownership or other interest in or to the Spectrum Intellectual Property.

Spectrum is in the business of developing solutions for a wide variety of clients, and Client understands that Spectrum will continue these activities utilizing its Spectrum Intellectual Property (including providing AVC and customized Spectrum Engine platforms), as well as derivatives of any components developed prior or during the term of its services to Client, whether or not such Spectrum Intellectual Property was used in Client's systems or the Deliverables.

The Deliverables shall include the "Spectrum Interactive" and/or "Spectrum Engine" logo, graphics or marks (as applicable) (collectively, the "***Spectrum Marks***") for the purpose of demonstrating that the Deliverables have been provided by Spectrum, and Spectrum hereby grants Client the limited, world-wide, irrevocable, royalty-free license (without the right to sublicense) to use the Spectrum Marks in accordance with the foregoing purpose.

Client hereby grants to Spectrum the limited, irrevocable, world-wide, royalty-free license (without the right to sublicense) to use the logos, trademarks or other identifying marks associated with Client for the purpose of identifying Client as a client or former client (so long as no Confidential Information is disclosed). Spectrum grants to Client the limited, revocable, world-wide, royalty-free license (without the right to sublicense) to use the logos, trademarks or other identifying marks associated with Spectrum for the purpose of identifying that Services have been provided by Spectrum. So long as either Spectrum or Client merely reference or display any of the foregoing logos, trademarks or identifying marks associated with the other party with a short description of Services, neither party shall need to obtain the permission of the other party. However, prior to any extended description of the Services by either party to the press, media outlets or other third parties, the party so describing the Services shall obtain the prior written consent of the other party.

Client represents and warrants that it owns all right, title and interest in and to all of the audio, video, text, photographic, graphical, metadata or other content provided to Spectrum for purposes of inclusion in the Deliverables (the "***Client Content***"). Client hereby grants to Spectrum the limited, irrevocable, world-wide, royalty-free license (without the right to sublicense) to use, make derivative works of and incorporate the Client Content into the Deliverables.

If Client breaches a material provision of this Agreement (or any Scope of Work, as applicable) and does not cure such breach within thirty (30) days after written notice from Spectrum, Spectrum will have the right at its option to (a) preclude use of the Deliverables by Client or any or all users until such breach is cured; (b) terminate this Agreement, such that Client or any or all users must cease all use of the Deliverables; or (c) seek a combination of (a) and (b) and those remedies available at law or equity to the extent not limited by this Agreement. The election of options (a), (b), or (c) herein will not excuse the Client (or any Participant) from any obligation arising prior to the date of termination. Spectrum reserves the right to terminate the Agreement in the event Client has breached a material provision of the Agreement two (2) or more times, regardless of whether Client has cured such breaches within the permitted time.

If Client uses the Deliverables in an unauthorized manner, Spectrum will have the right at its option to: (a) preclude use of the Deliverables by Client and any or all users until such time as Client converts or limits their use of the foregoing exclusively to an authorized use; or (b) terminate this Agreement, such that Client and any or all users must cease all use of the Deliverables. The election of options (a) or (b) herein will not excuse the Client from any obligation arising prior to the date of termination. For the avoidance of confusion, authorized uses include use by Company employees, Company partner stores and their employees through the Company's online training portals. If Spectrum uses any of the licensed intellectual property of Client in an unauthorized manner, Client will have the right to terminate this Agreement.

Upon termination of this Agreement for any reason, Client (and any or all user(s)) will cease use of the Deliverables immediately. If applicable, Client will return to Spectrum all copies of the software and the associated documentation in its possession or control, and immediately destroy any copies of the Deliverables installed on any servers at its location. Client will provide to Spectrum written notice of such destruction, signed by an officer of Client, within thirty (30) days of termination. Spectrum will not be liable to the Client for damages of any sort as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement will be without prejudice to any other right or remedy of either party.  Spectrum reserves the right to

remotely delete, block access to and/or uninstall the Deliverables and/or associated Interactive Videos in the event of termination of this Agreement.

**Section 3. Acceptance**
Client shall accept and pay for Deliverables which conform to the requirements of the Scope of Work. Client will notify Spectrum of any non-conformance of the Deliverables with such requirements ("***Non-conformance***") within ten (10) days of receipt of the Deliverables, and Spectrum shall have thirty (30) days, based on the severity and complexity of the Non-conformance, to correct the Non-conformance. If Client uses the Deliverables before acceptance, fails to promptly notify Spectrum of any Non-conformance, or unreasonably delays the beginning of acceptance testing, then the Deliverable shall be considered accepted by the Client.

**Section 4. Warranty**
(a) Spectrum warrants that the Services shall be performed with reasonable care in a diligent and competent manner. Spectrum's sole obligation shall be to correct any non-conformance with this warranty, provided that Client gives Spectrum written notice within ten (10) days after the Services are performed or successful completion of the acceptance test plan, if applicable.

(b) Spectrum represents and warrants that neither the Services nor any Deliverable will infringe the intellectual property or other property rights of any third party (note that this warranty does not extend to any portion of the Deliverables supplied by Client).

(c) Spectrum does not warrant and is not responsible for any third party products or services, except that Spectrum represents and warrants that the incorporation of third party services or products into the Deliverables by Spectrum shall not infringe any third party intellectual property or other property rights of any other party. Client's sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against Spectrum.

(d)  THIS SECTION 6 IS SPECTRUM'S ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE.

**Section 5. Risk Allocation**
(a) Neither Client's nor Spectrum's total liability relating to this Agreement shall in any event exceed the fees Spectrum receives hereunder. In no event shall either Spectrum or client be liable for any indirect, consequential, or incidental (including any loss of data, lost profits, savings or business opportunities), nor any special, punitive, treble or exemplary damages.

(b) To the maximum extent permitted by applicable law, the provisions of this Section 7 are intended to apply in all circumstances, regardless of the grounds or nature of any claim asserted (including contract, statute, any form of negligence, whether of Client, Spectrum, or others, tort, strict liability or otherwise) and whether or not the party seeking damages was advised of the possibility of the damage or loss asserted, to the extent not contrary to applicable law.

(c) Any action against Spectrum must be brought within eighteen (18) months after the cause of action arises.

(d) If either party hereto is delayed or hindered in, or prevented from, the performance of any act required under this Agreement (or any associated Statement of Work) by reason of strikes, walk outs, labor troubles, inability to procure materials, failure of power, a major storm, major flood or similar major natural disaster, restrictive governmental laws or regulations, riots, insurrection, terrorism, war or other reason of a like nature not the fault of the party delayed in performing work or doing as required under the terms of this Agreement (a "***Force Majeure***"), then performance of such act or obligation shall be excused for the period of the Force Majeure and shall be extended for a period equivalent to the period of such Force Majeure.  If a party wishes to claim protection in respect of a Force Majeure, it shall notify the other party of the nature and expected duration of such Force Majeure and shall thereafter keep the other party informed until such time as it is able to perform its obligations.  A Force Majeure shall not excuse either party from prompt payment of any monetary obligation under this Agreement.

(e) Each party will defend, indemnify, and hold the other party, as well as that party's officers, directors, representatives, employees, agents, and attorneys (each an "***Indemnified Person***"), harmless from, and

Indemnified Persons will have no liability for, any claims, demands, damages, liabilities, losses and expenses (including reasonable attorneys' fees) (collectively, "**Losses**") directly or indirectly arising out of (1) any claims that any of the intellectual property of the other party infringes the rights of any third party and (2) the misuse or violation of the Terms or this Agreement by any user controlled by or acting on behalf or at the direction of either party.

(f)  Client shall indemnify Spectrum and its Indemnified Persons and hold Spectrum and its Indemnified Persons harmless from and against any and all Losses, relating directly or indirectly to the incorporation of Client's content into the AVC, Spectrum Engine or Spectrum Intellectual Property, provided however that Client shall not indemnify Spectrum against any claims, demands, damages, liabilities, losses or expenses arising from Spectrum's gross negligence or willful misconduct. This indemnification shall survive the termination of this Agreement. It is expressly agreed that Spectrum does not provide any services to review the sufficiency, adequacy or legality of any training videos or other content provided by Client to Spectrum, and Client expressly agrees to bear any and all risk associated with third party claims and shall indemnify and hold harmless Spectrum and any Spectrum Indemnified Person from any and all Losses related to such content or use of the AVC, Spectrum Engine or Spectrum Intellectual Property in connection with the content.

### Section 6. Personnel
(a) Client agrees that Spectrum may use independent contractors in connection with the Services and Deliverables, in the ordinary course of Spectrum's business.

(b) During the term of this Agreement and for a period of two (2) years after (which, for purposes of this Agreement, the term shall be in place unless a party has notified the other party of the termination of this Agreement), each Spectrum and Client agree that it will not, directly or indirectly, in any manner within Orleans, Jefferson, Tangipahoa, St. Bernard or St. Tammany Parish, (1) call upon, solicit, divert, take away, accept or conduct any business from or with any of the customers or prospective customers of the other party or any of its suppliers, and/or (2) solicit, entice, attempt to persuade any other employee or consultant of the other party to leave the party for any reason or otherwise participate in or facilitate the hire, directly or through another entity, of any person who is employed or engaged by the other party during the term of this Agreement or who was employed or engaged by the other party within 6 months of any attempt to hire such person.

### Section 7. Termination
(a) This Agreement may be terminated at any time by either party upon thirty (30) days written notice to the other.

(b) Client shall pay Spectrum for all Services rendered and expenses incurred as of the date of termination, and shall reimburse Spectrum for all reasonable costs associated with any termination, including any specific termination fees for any service contracts in effect at time of termination. To the extent quoted on a flat fee or phase basis and termination occurs prior to the completion of any particular phase or other criteria set for such flat fee services, Spectrum may elect to charge Client for and Client shall pay for Services at an hourly rate then prevailing for services (or, if no hourly rate then prevails, at $100/hour) if Services are terminated before Deliverables are completed.

(c) Except for matters related to confidentiality or intellectual property rights (including without limitation the obligations of indemnity with respect to any intellectual property), the parties shall first attempt to resolve any dispute or alleged breach internally by escalating it to each party's management with final decision-making authority over the disputed issue; thereafter, and prior to either party initiating litigation, the parties agree to refer the matter to arbitration within thirty (30) days of the failure of the parties' management to resolve the issue, with such arbitration to be held before the American Arbitration Association in New Orleans, LA.

### Section 8. Tax Credit Applications
To the extent that any of the Services qualify for any state or federal tax credit program based on expenditures made (refundable or non-refundable), then Client and Spectrum agree that Spectrum shall be solely responsible for and entitled to claim any such tax credits based on expenditures under this Agreement or any Statement of Work. Without limiting the generality of the foregoing, Client hereby assigns, transfers and conveys to Spectrum any right, title and interest in and to any expenditure based tax credits directly related to the Deliverables or Services provided hereunder for the term of this Agreement.

### Section 9. General

(a)This Agreement may not be assigned or otherwise transferred by Client without the prior express written consent of Spectrum, except in the case of merger or acquisition of all or substantially all of the equity securities or assets of Client ("***Change of Control Assignment***"). In the event of a Change of Control Assignment, Client shall provide Spectrum with written notice no later than fifteen (15) days prior to the consummation of such event. Spectrum shall be permitted to assign this Agreement to an affiliate of its organization or use subcontractors to provide Services in its sole discretion. Spectrum may assign this agreement in connection with a Change of Control Assignment on the same terms as Client.

(b) Any notices given pursuant to this Agreement shall be in writing, delivered to the address (physical or email) set forth on the signature page to this Agreement, and shall be considered given when sent without notice of a failure of delivery.

(c)  No term of this Agreement shall be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(d)  If any term or provision of this Agreement is determined to be illegal or unenforceable, such term or provision shall be deemed stricken, and all other terms and provisions shall remain in full force and effect.

(e)This Agreement does not make either party an agent or legal representative of the other party, and does not create a partnership or joint venture. Both parties are independent contractors and principals for their own accounts.

(f)  Sections 3 through 11 of this Agreement shall survive the expiration or termination of this Agreement.

(g)The laws of the State of Louisiana shall govern this Agreement. Any action or suit related to this Agreement shall be brought in the state or federal courts sitting in Orleans Parish, Louisiana, after first complying with the provisions respecting mediation.

(h)      Client acknowledges that: (1) Spectrum and Client may correspond or convey documentation via the Internet or e-mail unless Client expressly requests otherwise, (2) neither party has control over the performance, reliability, availability, or security of Internet e-mail, and (3) Spectrum shall not be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond Spectrum's reasonable control.

(j) No failure or delay by Spectrum in enforcing any right or remedy under this Agreement shall be construed as a waiver of any future or other exercise of such right or remedy by Spectrum.

(j) It is understood that there may be a need or recommendation by Spectrum for Client to use third party software or goods or services ("***Third Party Materials***") as part of the provision of the Services and development of the Deliverables. Any Third Party Materials and intellectual property owned by third parties and provided to Client will remain the sole and exclusive property of such third parties and subject to applicable license terms or terms of use (if any). Third Party Materials may include, among other things, server software, database software, open source software (unless otherwise specified in a Scope of Work), fan curated content, images of persons, places or objects. Upon approval by the Client for the use of such Third Party Materials, the Client shall take responsibility for the intellectual property rights and risks associated with such Third Party Materials.

(k) To the extent that the Deliverables are integrated with any third party services, including social media services (e.g., Facebook, Twitter, Instagram, Tumblr, SnapChat, YouTube etc.), as between Client and Spectrum, Client is solely responsible for ensuring that its use of those third party services is in compliance with any applicable terms and conditions, guidelines, and privacy policies of such third party services. Spectrum is not liable for Client's actions or non-actions or the use of third parties of any Deliverable through such third party services, terms, conditions, or policies.

4821-9487-3907, v.  1